1
2
3
4
5
6

UNITED STATES DISTRICT COURT

7

WESTERN DISTRICT OF WASHINGTON

8

AT SEATTLE

9
10
11

CINDY BALMORES,
JUSTIN BRASWELL,
DEBORAH GARVIN, and
THEA ANDERSON,
for themselves,
as private attorneys general, and
on behalf of all others similarly situated,

Plaintiffs,

v.

SIRIUS XM RADIO INC.,

Defendant.

Case No. 2:24-cv-886

**CLASS ACTION COMPLAINT FOR**

**(1) VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT, RCW 19.86**

**(2) VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

**(3) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (PLEADED IN THE ALTERNATIVE)**

**JURY TRIAL DEMANDED**

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Cindy Balmores, Justin Braswell, Deborah Garvin, and Thea Anderson, individually, as private attorneys general, and on behalf of all others similarly situated, allege as follows, on personal knowledge and investigation of their counsel, against Defendant Sirius XM Radio Inc. ("Sirius XM" or "Defendant"):

## INTRODUCTION AND SUMMARY

1.      This action challenges a deceptive pricing scheme whereby Sirius XM falsely advertises its music plans at lower prices than it actually charges. Sirius XM fails to include in its advertised prices the amount of its invented "U.S. Music Royalty Fee," which increases the true plan price by 21.4% above the advertised price for the plans.[1]

2.      Sirius XM intentionally does not disclose the Fee to its subscribers. Sirius XM even goes so far as to not mention the words "U.S. Music Royalty Fee" in <u>any</u> of its advertising, including in the fine print.

3.      Once consumers have been lured to sign up, Sirius XM prevents them from learning about its scheme by never thereafter sending them monthly or ongoing billing notices or invoices. All the while, Sirius XM silently and automatically renews their subscriptions month after month and year after year. And, as the price of its subscribers' music plans increase—e.g., when a promotional rate expires—the U.S. Music Royalty Fee amount, being a flat 21.4% charge, also increases.

4.      Notably, <u>none</u> of Sirius XM's competitors charge any separate royalty fee over and above their advertised music plan prices. Reasonable consumers would expect that the advertised price for Sirius XM's music plans would include the fundamental costs of obtaining the permissions necessary to provide the music content that Sirius XM has promised is included in those plans. The U.S. Music Royalty Fee is, in fact, simply a disguised double-charge for the music plan itself.

---

[1] The rate for the U.S. Music Royalty Fee is 21.4% for Sirius XM's <u>satellite radio</u> music plans (which comprise the overwhelming majority of Sirius XM subscriptions), and 8.8% for Sirius XM's <u>streaming-only</u> music plans (which are internet-only and do not require a satellite radio, and which comprise a tiny minority of Sirius XM subscriptions).

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

5.      Even the name of the U.S. Music Royalty Fee is deceptive. Sirius XM calls it a "U.S." fee to falsely indicate to consumers (i.e., to those few consumers who learn about its existence) that it is a government-related fee.

6.      In the event that a subscriber happens to notice the U.S. Music Royalty Fee has been charged and then contacts Sirius XM to inquire about the Fee, Sirius XM has a practice of outright falsely telling the subscriber that it is "government mandated" or is a government pass-through fee.

7.      Sirius XM's U.S. Music Royalty Fee scheme has been the source of <u>all</u> of Sirius XM's profits for the past several years. For example, in 2023, Sirius XM collected $1.36 billion in U.S. Music Royalty Fee charges, while the entire company had net profits of $1.26 billion. In other words, in 2023, U.S. Music Royalty Fee revenues were equal to 108% of the net profits for the entire company.[2]

8.      Sirius XM falsely advertised the prices of its music plans to Plaintiffs and Class members, and Sirius XM never adequately disclosed to them that the U.S. Music Royalty Fee would be charged or its true nature. Meanwhile, Sirius XM's sign-up process, automatic renewal process, and policy of not sending monthly or ongoing billing notices or invoices are deliberately designed to prevent subscribers from learning of the U.S. Music Royalty Fee.

9.      Sirius XM automatically charges the U.S. Music Royalty Fee to nearly all of its 792,000 Washington state subscribers and 2,262,000 Florida subscribers (the Fee currently accounts for over $31 million in annual charges to Washington state subscribers and over $90 million in annual charges to Florida subscribers).[3] Since Sirius XM invented and introduced the

---

[2] In 2023, Sirius XM had subscriber revenues from its SiriusXM-branded service of $6.34 billion, approximately 21.4% of which (i.e., $1.36 billion) were payments of the U.S. Music Royalty Fee. *See* 2023 10-K of Sirius XM Holdings Inc., pp. F-5, F-39, available at https://investor.siriusxm.com/sec-filings/all-sec-filings/content/0000908937-24-000008/0000908937-24-000008.pdf.

[3] Plaintiffs estimate that Sirius XM has approximately 792,000 music plan subscribers in Washington state, which would comprise 2.34% of Sirius XM's 33.9 million subscribers (Washington represents 2.34% of the U.S. population). Plaintiffs estimate that Sirius XM has approximately 2,262,000 music plan subscribers in Florida, which would comprise 6.67% of Sirius XM's 33.9 million subscribers (Florida represents 6.67% of the U.S. population).

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

Fee in 2009, Plaintiffs estimate that Sirius XM has unlawfully extracted over $242 million from Washington consumers and over $690 million from Florida consumers in U.S. Music Royalty Fee charges.

10.     Plaintiffs Cindy Balmores, Justin Braswell, Deborah Garvin, and Thea Anderson bring this lawsuit individually and as private attorneys general seeking public injunctive relief to protect the general public by putting an end to Sirius XM's unlawful advertising scheme. Additionally, all four Plaintiffs bring this lawsuit on behalf of themselves and a class of Washington Sirius XM subscribers, seeking damages and treble damages. Plaintiff Deborah Garvin also brings this lawsuit on behalf of herself and a class of Florida Sirius XM subscribers, seeking damages. In the alternative, Plaintiffs seek damages for breach of the implied covenant of good faith and fair dealing to Plaintiffs and Class members in the amount they paid in U.S. Music Royalty Fees.

11.     To be clear, Plaintiffs are <u>not</u> seeking to regulate the existence or amount of the U.S. Music Royalty Fee (although Plaintiffs contend that the name of the Fee is deceptive because Sirius XM intentionally calls it a "U.S." fee to trick consumers into thinking it is a government-related fee). Rather, Plaintiffs want Sirius XM to include the <u>amount</u> of the so-called U.S. Music Royalty Fee in the music plan prices it advertises to the general public, and to adequately disclose the Fee and its true nature and basis.

## THE PARTIES

12.     Plaintiff Cindy Balmores is a citizen and resident of the city of Edmonds, in Snohomish County, Washington.

13.     Plaintiff Justin Braswell is a citizen and resident of the city of Spanaway, in Pierce County, Washington.

14.     Plaintiff Deborah Garvin has been a citizen and resident of the city of Vancouver, in Clark County, Washington, since 2022. Prior to that, she was a citizen and resident of Florida.

15.     Plaintiff Thea Anderson is a citizen and resident of the city of Spokane, in Spokane County, Washington.

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

16.    Defendant Sirius XM Radio Inc. ("Sirius XM") is a corporation chartered under the laws of Delaware, with its principal place of business in New York.

## JURISDICTION AND VENUE

17.    **Subject Matter Jurisdiction.** This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because the amount in controversy, exclusive of interest and costs, exceeds $5,000,000, and this is a proposed class action in which there are members of the proposed Class who are citizens of a state different from the Defendant.

18.    **Personal Jurisdiction.** This Court has personal jurisdiction over Sirius XM because, without limitation: (1) Sirius XM is authorized to do business and regularly conducts business in the Washington; (2) the claims alleged herein took place in Washington; and/or (3) Sirius XM has committed tortious acts within Washington (as alleged, without limitation, throughout this Complaint). Sirius XM has sufficient minimum contacts with Washington to render the exercise of jurisdiction by this Court permissible.

19.    **Venue.** Venue is proper pursuant to 28 U.S.C. §1391 because Plaintiffs Cindy Balmores, Justin Braswell, and Deborah Garvin are Washington citizens who reside in this District. Additionally, Plaintiffs Cindy Balmores and Justin Braswell purchased their Sirius XM music plans in this District, and Plaintiff Deborah Garvin purchased her most recent Sirius XM music plan in this District.

## FACTUAL ALLEGATIONS OF SIRIUS XM'S DECEPTIVE PRICING SCHEME

20.    Defendant provides Sirius XM-branded satellite radio and streaming plans to approximately 33.9 million consumers nationwide[4], including approximately 792,000 Washingtonians and 2,262,000 Floridians. Nearly all of the service plans offered by Sirius XM include music channels ("music plans").

21.    Sirius XM falsely advertises its music plans at lower rates than it actually charges by not including in the advertised price the amount of its invented "U.S. Music Royalty

---

[4] *See* 2023 10-K of Sirius XM Holdings Inc., p. 5, available at https://investor.siriusxm.com/sec-filings/all-sec-filings/content/0000908937-24-000008/0000908937-24-000008.pdf.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

Fee." Sirius XM intentionally does not disclose the extra charge. Sirius XM even goes so far as to not mention the words "U.S. Music Royalty Fee" in <u>any</u> of its advertising, including in the fine print. Once consumers have been lured to sign up, Sirius XM prevents them from learning about its scheme by never thereafter sending them monthly or ongoing billing notices or invoices. All the while, Sirius silently and automatically renews their subscriptions month after month and year after year.

22.     Sirius XM imposes the U.S. Music Royalty Fee on all subscribers of its satellite radio music plans (satellite radio subscribers comprise the overwhelming majority of Sirius XM subscribers), at a rate of 21.4% on top of the advertised and promised price of the music plan. Sirius XM also imposes the U.S. Music Royalty Fee on the relatively few subscribers of its Sirius XM-branded internet-only streaming music plans (which do not require a satellite radio), at a rate of 8.8% on top of the advertised and promised price of the music plan.[5]

23.     The overwhelming majority of Sirius XM subscribers utilize Sirius XM's services in their automobiles. There are approximately 160 million vehicles in operation with Sirius XM radios.[6] Sirius XM's satellite radios are pre-installed in 84% of the over 13 million new automobiles sold each year in the United States.[7] All of the 13 million-plus annual buyers of new vehicles are <u>automatically</u> provided a free two- to six-month trial of Sirius XM service. Sirius XM's satellite radios are also already installed in 51% of the 36 million used automobiles sold each year.[8] Many of the buyers of these used vehicles are likewise automatically enrolled in free Sirius XM trials.

---

[5] The only Sirius XM internet-only streaming music plan subscribers who are not charged the U.S. Music Royalty Fee are streaming music subscribers who are signed up and billed through the Apple App Store or Google Play Store platforms.

[6] *See* 2023 10-K of Sirius XM Holdings Inc., p. 5, available at https://investor.siriusxm.com/sec-filings/all-sec-filings/content/0000908937-24-000008/0000908937-24-000008.pdf.

[7] *See* "Car Market Puts Sirius XM's 2022 Growth Plans Into The Slow Lane," InsideRadio.com, July 28, 2022, available at https://www.insideradio.com/free/car-market-puts-Sirius XM-s-2022-growth-plans-into-the-slow-lane/article_c577b85c-0ea6-11ed-a4f3-6316ccfafd88.html#:~:text=Its%20receivers%20are%20now%20installed,satellite%20radio%20don't%20bother.

[8] *Id. See also* report on used vehicle market based on data from Cox Automotive, at

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

24.     Sirius XM's business model relies on converting these millions of vehicle buyers from free trial users into paid subscribers of automatically renewing music plans.

25.     This effort begins with a revenue-sharing arrangement with the leading automakers: Sirius XM pays over $1 billion a year in subsidies and revenue splits to the automakers.[9] Pursuant to this revenue sharing arrangement, automotive dealerships submit the contact information of their recent car buyers directly to Sirius XM's marketing department. The automakers and auto dealers then get a cut of the Sirius XM subscription revenue that results.

26.     After receiving the contact information of the vehicle buyers, Sirius XM proceeds to inundate them with marketing emails, direct mailers, and telemarketing calls in an attempt to get the consumers to provide their credit or debit card information to Sirius XM so that Sirius XM can sign them up for paid—and automatically renewing—music plan subscriptions.

**A.      The U.S. Music Royalty Fee.**

27.     The U.S. Music Royalty Fee is an additional flat charge that Sirius XM collects from its music plan subscribers over and above the advertised and promised prices of its music plans. The overwhelming majority of Sirius XM customers subscribe to its <u>satellite radio</u> music plans (which require a satellite radio, and are typically attached to a particular vehicle equipped with a Sirius XM satellite radio). Sirius XM charges its satellite radio music plan subscribers a 21.4% U.S. Music Royalty Fee on top of the advertised and promised price of the music plan.

28.     In 2019, Sirius XM introduced a separate <u>streaming-only</u> music plan option, which worked over the internet and did not utilize or require a satellite radio. A very tiny

---

https://www.autonews.com/used-cars/used-car-volume-hits-lowest-mark-nearly-decade#:~:text=The%20number%20of%20used%20cars,about%2035.8%20million%20were%20sold.

[9] For example, in 2016, Sirius XM paid about $1 billion a year in subsidies and revenue splits to automakers. *See* Sisario, Ben, "Sirius XM Fights to Dominate the Dashboard of the Connected Car," New York Times, February 20, 2016 (behind pay wall at https://www.nytimes.com/2016/02/21/business/media/Sirius XM-fights-to-dominate-the-dashboard-of-the-connected-car.html).

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

minority of Sirius XM customers subscribe to such an internet streaming-only music plan. Sirius XM charges its (few) internet streaming-only music plan subscribers an 8.8% U.S. Music Royalty Fee on top of the advertised and promised price of the streaming music plan.

29.     Sirius XM invented and first added the U.S. Music Royalty Fee to its music plans in 2009, at a 13.9% flat rate charge. Since then Sirius XM has increased the Fee to the current 21.4% rate.

30.     Sirius XM's U.S. Music Royalty Fee scheme has been the source of all of Sirius XM's profits for the past several years. For example, in 2023, Sirius XM collected $1.36 billion in U.S. Music Royalty Fee charges, while the entire company had net profits of $1.26 billion. In other words, in 2023, U.S. Music Royalty Fee revenues were equal to 108% of the net profits for the entire company.[10]

31.     The U.S. Music Royalty Fee scheme is at the heart of Sirius XM's marketing plan. The scheme enables Sirius XM to falsely advertise its music plans at much lower prices than what Sirius XM actually charges, in order to lure as many consumers as possible into signing up for automatically renewing subscriptions and paying more than they otherwise would have paid.

32.     Meanwhile, Sirius XM is alone in charging such a fee. None of Sirius XM's major music streaming competitors (for example, Apple Music, Spotify, Amazon Music, Google Play Music) charge any such separate music royalty fee over and above their advertised music plan prices. Reasonable consumers would expect that the advertised price for Sirius XM's music plans would include the fundamental cost of obtaining the permissions necessary to provide the music content that Sirius XM has promised is included in those plans. The U.S. Music Royalty Fee is, in fact, simply a disguised double-charge for the music plan itself.

---

[10] In 2023, Sirius XM had subscriber revenues from its Sirius XM-branded service of $6.34 billion, approximately 21.4% of which (i.e., $1.36 billion) were payments of the U.S. Music Royalty Fee. *See* 2023 10-K of Sirius XM Holdings Inc., pp. F-5, F-39, available at https://investor.siriusxm.com/sec-filings/all-sec-filings/content/0000908937-24-000008/0000908937-24-000008.pdf.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

33.     Sirius XM automatically charges the U.S. Music Royalty Fee to nearly all of its 792,000 Washington state subscribers and 2,262,000 Florida subscribers (the Fee currently accounts for over $31 million in annual charges to Washington state subscribers and over $90 million in annual charges to Florida subscribers). Since Sirius XM invented and introduced the Fee in 2009, Plaintiffs estimate that Sirius XM has unlawfully extracted over $242 million from Washington consumers and over $691 million from Florida consumers in U.S. Music Royalty Fee charges.

**B.      Sirius XM Misrepresents the Price of Its Music Plans in Its Advertisements and Fails to Disclose the U.S. Music Royalty Fee.**

34.     Sirius XM advertises its satellite radio and streaming music plans through marketing directed at the consuming public in Washington and Florida and throughout the United States via email campaigns, direct mail campaigns, telemarketing campaigns, internet advertising, television advertising, and radio advertising. Meanwhile, the tens of millions of automobiles which are equipped with a Sirius XM satellite radio, but which do not have an active trial or a current paid subscription, will constantly prompt the consumer to subscribe to Sirius XM anytime the consumer switches the car audio system to the Sirius XM radio setting.

35.     Through all of these channels, Sirius XM prominently and misleadingly advertises particular flat monthly or periodic prices for its music plans, without disclosing or including the amount of the U.S. Music Royalty Fee in the advertised price.

36.     None of Sirius XM's advertisements states the true music plan price after adding the amount of the U.S. Music Royalty Fee. None of Sirius XM's advertisements names or mentions the existence of the U.S. Music Royalty Fee or its amount—not even in the fine print. And there is no asterisk adjacent to the (deceptively low) advertised price in any of Sirius XM's advertisements or materials.

37.     Meanwhile, none of Sirius XM's competitors charge any separate royalty fee over and above the advertised music plan price. Sirius XM knows that reasonable consumers would not expect Sirius XM to charge the U.S. Music Royalty Fee, which is really just a disguised double-charge for the service itself.

CLASS ACTION COMPLAINT - 8

38.     **Example Promotional Mailer.** Below is an example of a marketing direct mailer sent by Sirius XM in December 2022 to a consumer who was in a Sirius XM free trial that automatically came with a new vehicle:

**Sirius XM Promotional Mailer to Consumer in Free Trial With New Vehicle**



HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1    39.     The above mailer is a typical example of the millions of promotional mailers

2    that Sirius XM sends to new vehicle purchasers each year. Notably, the top right of the ad

3    features "Get 12 Months for $5/Month," but makes no mention of the U.S. Music Royalty Fee

4    or the extra 21.4% (i.e., the extra $1.07) that the plan actually costs due to the Fee. There is no

5    asterisk next to the advertised price. Nowhere in the entire mailer—not even in the fine print at

6    the bottom—is there any mention whatsoever of the U.S. Music Royalty Fee or its amount. The

7    only disclosure language in the entire mailer is the phrase "Fees and taxes apply," which is in

8    small print in the circle on the left of the ad, where it also says, "See Offer Details below."

9    40.     But the "Offer Details" (which can be found in the fine print at the bottom of the

10   mailer) likewise only states the same phrase "Fees and taxes apply," with no further details. It

11   does not mention the U.S. Music Royalty Fee by name or what the additional "Fees and taxes"

12   are or their amounts. The "Offer Details" fine print states that the plan will renew after the 12-

13   month promotion "at then-current rates (currently, $17.99)"—but again does not disclose that

14   the actual rate the plan will be renewed at is 21.4% higher (at a true rate of $21.84) due to the

15   U.S. Music Royalty Fee. Nor does the mailer mention that, as the music plan rate increases

16   from $5 to $17.99, the (undisclosed) Fee will more than triple from $1.07 to $3.85.[11]

17

18

19

20

21

22

23

24   _____

[11] The intentional nature of Sirius XM's misrepresentations and omissions are further
25   evidenced by the fact that while the United States company Sirius XM Radio Inc. (the
     Defendant) made the decision to completely avoid mentioning the name of the U.S. Music
26   Royalty Fee or its amount in any of its advertising, the company's Canadian sister company,
     Sirius XM Canada Inc., chose a different, more honest approach. Sirius XM Canada Inc.
27   (unlike Defendant) discloses both the name of the fee (which in Canada is called the "Music
     Royalty and Administrative Fee") and its percentage amount in the "Offer Details" fine print of
28   its otherwise identical ads.

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

41.     **Example Marketing Email.** Below is an example of a marketing email sent by Sirius XM in February 2023 to a consumer whose free Sirius XM trial elapsed (the free trial came with the purchase of a new vehicle):

**Sirius XM Promotional Email to Consumer Whose Free Trial Elapsed**



42.     The above email is a typical example of the millions of emails Sirius XM sends to purchasers of new automobiles who are in an automatic free trial of Sirius XM or whose trial has elapsed. Notably, the email states the price is "JUST $5/MO," but makes no mention of the U.S. Music Royalty Fee or the extra 21.4% (i.e., the extra $1.07) that the plan actually costs

CLASS ACTION COMPLAINT - 11

1    due to the Fee. There is no asterisk next to the advertised price, and in fact nowhere in the

2    entire email—not even in the fine print at the bottom—is there any mention whatsoever of the

3    U.S. Music Royalty Fee or its amount. There is a phrase "See Offer Details," but there is no

4    "Offer Details" section in the email. It turns out that the white "Offer Details" text is a non-

5    obvious hyperlink (with no hyperlink indicators). If the consumer figured out to click on the

6    "Offer Details" text on the email, the consumer would be brought to the webpage below:

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

43.     This offer/disclaimer webpage features "$5/mo for 12 months," but makes no mention of the U.S. Music Royalty Fee or the extra 21.4% (i.e., the extra $1.07) which the plan actually costs due to the Fee. Below the prominent text "$5/mo for 12 months," smaller text reads "Then $18.99/mo. Fees & taxes apply. See **Offer Details** below."

44.     But the fine print "Offer Details" at the bottom of the webpage states only the same phrase "Fees and Taxes apply," with no further details. It does not mention the U.S. Music Royalty Fee by name or what the additional "Fees and Taxes" are or their amounts. It also fails to mention that the renewal rate will not be the promised "$18.99/mo." but rather will be 21.4% higher—where the undisclosed Fee will increase nearly four-fold to $4.06—for an actual total of $23.05 per month.

**C.     Sirius XM Fails to Disclose the U.S. Music Royalty Fee to Consumers When They Sign Up on Its Website.**

45.     For years, Sirius XM's consumer website has advertised its music plans by featuring particular flat monthly or periodic prices for the plans, without disclosing or including the amount of the U.S. Music Royalty Fee in the advertised price.

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

46.     For example, in May 2023, Sirius XM's website listed the following music plans (on the "Browse Plans and Pricing" webpage).

**Music Plans Offered on the Sirius XM Website**



47.     All of these options (including both the 3-month promotional $1 price, and the stated higher prices after the 3 months) are presented as having a flat rate. The prices exclude the additional 21.4% charge for the U.S. Music Royalty Fee. The prices do not have asterisks and the only disclosure language is on the left side, where smaller print says, "Plus fees and taxes See Offer Details Below." But the "Offer Details" at the bottom of the webpage (which follows a section of "Frequently Asked Questions" that likewise makes no mention of the Fee),

CLASS ACTION COMPLAINT - 14

states only the same phrase "Fees and taxes apply." It does not mention the U.S. Music Royalty Fee by name or what the additional "Fees and taxes" are or their amounts.

48.     If the consumer clicks on the blue "GET" button for the respective music plan, the consumer is taken through Sirius XM's online purchase process. Each page of the purchase process features "$1 for 3 months" on the top, and smaller text stating the higher price after the 3 months (e.g., "Then 23.99/mo.").

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

49.        **Below is the final page of the online purchase process** (i.e., the order submission page) for the Platinum music plan. This final page is the only page of the entire online purchase process which lists a specific additional amount for "Fees and Taxes."

50.     Under "Order Summary," Sirius XM shows a price of $1.00 for 3 months of the music plan ($0.33/mo), plus "Fees and Taxes" of $0.21.

51.     Notably, counsel's investigation showed that all Sirius XM music plans (including this one) sold in Washington have $0.00 in "Taxes." And the only "Fee" Sirius XM ever charges in Washington is the undisclosed 21.4% U.S. Music Royalty Fee. Sirius XM disguises the amount of its invented and deceptive U.S. Music Royalty Fee as "Fees and Taxes." Yet in reality, the U.S. Music Royalty Fee is the sole and exclusive component of the so-called "Fees and Taxes."

52.     In this example, the $0.21 in "Fees and Taxes" is comprised entirely of the unmentioned 21.4% U.S. Music Royalty Fee (i.e., $0.21 = 21.4% of the $1.00 plan price). Similarly, when the promotional rate of "$1.00 for 3 months" expires and the subscriber's monthly rate automatically increases to the stated "$23.99/mo.," the U.S. Music Royalty Fee comprises the entire amount of the additional "Fees and Taxes" of $5.13 per month.

53.     Sirius XM knows and intends that reasonable consumers will understand and assume that the amount listed as "Fees and Taxes" is comprised of legitimate taxes and government-related fees passed on by Sirius XM to its subscribers. Sirius XM knows and intends that reasonable consumers would not expect that Sirius XM—unlike every other music streaming service—would invent and charge the so-called "U.S. Music Royalty Fee" over and above the advertised price for the music plan. And Sirius XM knows that consumers certainly would not expect such a charge to be disguised as "Fees and Taxes."

**D.      Sirius XM Fails to Disclose the U.S. Music Royalty Fee to Consumers When They Sign Up Over the Phone.**

54.     Likewise, Sirius XM sales and customer service agents have been trained for years, as a matter of company policy, to present consumers with advertised flat monthly or periodic prices for its music plans without disclosing the U.S. Music Royalty Fee. The music plan prices that agents quote to consumers—just like Sirius XM's advertising—exclude the cost of the U.S. Music Royalty Fee.

CLASS ACTION COMPLAINT - 17

55.     Sirius XM knows that reasonable consumers would expect that the advertised and quoted price for Sirius XM's music plans would include the fundamental costs of obtaining the permissions necessary to provide the music content that Sirius XM has promised is included in those plans. The U.S. Music Royalty Fee is, in fact, simply a disguised double-charge for the music plan itself.

56.     Sirius XM's U.S. Music Royalty Fee scheme enables Sirius XM to falsely advertise and present its music plans at much lower prices than what Sirius XM actually charges, in order to lure as many consumers as possible into signing up for automatically renewing subscriptions and paying more than they otherwise would have paid.

**E.      In Order to Prevent Subscribers From Learning of Its Scheme, Sirius XM Signs Up Subscribers for Auto-Renewal by Default and Then Never Sends Them Monthly or Ongoing Billing Notices or Invoices.**

57.     Sirius XM's automatic renewal and billing process are designed to prevent its subscribers from learning of its U.S. Music Royalty Fee scheme. Sirius XM signs up subscribers for automatic renewal by default (most subscribers have monthly plans, but Sirius XM also offers quarterly, semi-annual, and longer plans).

58.     Once consumers have been lured to sign up, Sirius XM prevents them from learning about its scheme by never thereafter sending them monthly or ongoing billing notices or invoices. All the while, Sirius XM silently and automatically renews their subscriptions month after month and year after year

59.     Most Sirius XM subscribers initially sign up with Sirius XM by providing their credit card or debit card for a free multi-month trial or for a multi-month greatly discounted promotional rate. The only evidence of the ongoing monthly (or other subscription term) charges by Sirius XM that a subscriber may find is on his or her bank or credit card billing statement—which only lists a dollar amount and makes no mention of the U.S. Music Royalty Fee.

60.     It is telling that while Sirius XM intentionally sends <u>zero</u> monthly or ongoing billing notices or invoices to its subscribers, Sirius XM meanwhile makes sure to inundate and benumb these same subscribers with <u>marketing</u> emails nearly every other day (totaling over a

CLASS ACTION COMPLAINT - 18

dozen each month), such that subscribers come to assume that any emails they receive from Sirius XM are marketing or promotional emails.

**F.      Sirius XM Continues to Deceive Subscribers After They Sign Up.**

61.     Sirius XM continues to deceive subscribers about the true price of its music plans and about the existence and nature of the U.S. Music Royalty Fee, even after they have signed up.

62.     As discussed above, once consumers have been lured to sign up, Sirius XM prevents them from learning about its scheme by never thereafter sending them monthly or ongoing billing notices or invoices.

63.     But even <u>if</u> a subscriber discovered the existence of the U.S. Music Royalty Fee, Sirius XM has taken actions and implemented policies to intentionally mislead the subscriber into thinking it is "government mandated" or is a government pass-through fee.

64.     First, Sirius XM intentionally chose a name for the Fee that suggests it is a government fee. Sirius XM calls it a "U.S." fee to falsely indicate to consumers (i.e., to those few subscribers who learn about its existence) that it is government mandated or is a government pass-through fee.

65.     Second, in the event that a subscriber contacts Sirius XM to inquire about the Fee, Sirius XM agents outright falsely tell the subscriber that the Fee is "government mandated" or is a government pass-through fee.

66.     For example, below is a screenshot of part of an online chat conversation that a subscriber had with Sirius XM on March 10, 2023, where the Sirius XM agent falsely told the subscriber that the U.S. Music Royalty Fee was "government mandated":

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

67.    The chat agent's statement that the U.S. Music Royalty Fee was "government mandated" reflects Sirius XM's policy of falsely telling subscribers who ask about the Fee that it is government mandated or is a government pass-through fee.

## PLAINTIFFS' FACTUAL ALLEGATIONS

**Plaintiff Cindy Balmores**

68.    Plaintiff Cindy Balmores is, and at all relevant times has been, a citizen and resident of the city of Edmonds, in Snohomish County, Washington.

69.    In October 2018, Ms. Balmores purchased a car that came with a free Sirius XM music plan trial subscription.

70.    In April 2019, after the free trial had ended, Ms. Balmores received a promotional email from Sirius XM in which Sirius XM was offering a promotional price of $99 for a one-year music plan subscription. Ms. Balmores called Sirius XM to ask about the promotional offer and to learn more about Sirius XM's other music plans and prices. The agent that she spoke with confirmed that Sirius XM was offering a promotional price of $99 for a

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

one-year music plan subscription. The agent quoted her the specific price of $99 for the one-year music plan subscription. The music plan's price of $99 did not include the cost of the U.S. Music Royalty Fee. The agent also did not mention the existence of the U.S. Music Royalty Fee.

71.     Relying on the representations of the Sirius XM agent, Ms. Balmores purchased the music plan subscription.

72.     Near the end of her one-year subscription, Ms. Balmores called Sirius XM and told the agent that she spoke with that she wanted the same promotional offer as before—$99 for a one-year music plan subscription. The agent agreed to give her the same promotional offer. The agent quoted her the specific price of $99 for the one-year music plan subscription. The music plan's price of $99 did not include the cost of the U.S. Music Royalty Fee. The agent also did not mention the existence of the U.S. Music Royalty Fee.

73.     Relying on the representations of the Sirius XM agent, Ms. Balmores purchased the music plan subscription.

74.     Near the end of this second one-year subscription, Ms. Balmores called Sirius XM to ask for the same promotional offer. And, once again, the agent agreed to give her the same promotional offer. The agent quoted her the specific price of $99 for the one-year music plan subscription. The music plan's price of $99 did not include the cost of the U.S. Music Royalty Fee. The agent also did not mention the existence of the U.S. Music Royalty Fee.

75.     Relying on the representations of the Sirius XM agent, Ms. Balmores purchased the music plan subscription.

76.     Near the end of this third one-year subscription, Ms. Balmores called Sirius XM to ask for the same promotional offer. This time, however, the agent that she spoke with told her that Sirius XM was no longer offering this one-year music plan subscription promotion. Instead, the agent quoted her a specific monthly price for the music plan that she wanted. The quoted price for the music plan did not include the cost of the U.S. Music Royalty Fee. The agent also did not mention the existence of the U.S. Music Royalty Fee.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

77.     Relying on the representations of the Sirius XM agent, Ms. Balmores purchased the music plan subscription.

78.     A few months later, Ms. Balmores canceled her Sirius XM subscription.

79.     In March 2024, Ms. Balmores received a Sirius XM advertisement in which Sirius XM was offering a promotional price of $5 a month for six months for one of Sirius XM's music plans. Ms. Balmores called Sirius XM to ask about the promotional offer. The agent that she spoke with confirmed that Sirius XM was offering this promotion. The agent quoted her the specific price of $5 a month for the music plan. The music plan's price of $5 did not include the cost of the U.S. Music Royalty Fee. The agent also did not mention the existence of the U.S. Music Royalty Fee.

80.     Relying on the representations of the Sirius XM agent, Ms. Balmores purchased the music plan subscription.

81.     Since Ms. Balmores signed up, Sirius XM has never emailed or mailed her a single monthly billing notice or invoice.

82.     Meanwhile, each and every month, Sirius XM inundated Ms. Balmores' email inbox with a dozen or so marketing and promotional emails. None of these marketing emails made any mention whatsoever of the existence of the U.S. Music Royalty Fee.

83.     Each time that Ms. Balmores signed up for a Sirius XM music plan, she was relying on Sirius XM's explicit representations regarding the monthly price of the music plan. Ms. Balmores did not expect (and she was never told) that Sirius XM would actually charge her an additional music plan charge on top of the advertised and quoted music plan price in the form of a so-called U.S. Music Royalty Fee or that the true price of the music plan would include the additional cost of the U.S. Music Royalty Fee. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her music plans and would have acted differently.

84.     Ms. Balmores has a legal right to rely now, and in the future, on the truthfulness and accuracy of Sirius XM's representations and advertisements regarding its music plan

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

prices. Ms. Balmores believes that she was given the services Sirius XM promised her—just not at the prices Sirius XM promised and advertised to her.

85.     Ms. Balmores remains a Sirius XM subscriber as of this filing. Ms. Balmores desires to sign up for Sirius XM music plans in the future. However, Ms. Balmores wants to be confident that the advertised and quoted price for Sirius XM's music plans is the true and full price for the plan (i.e., that it includes all applicable discretionary monthly service charges such as the U.S. Music Royalty Fee). And, if Sirius XM introduces any new or invented discretionary monthly service charge (like it did with the U.S. Music Royalty Fee), Ms. Balmores wants to be confident that Sirius XM will include the amount of that service charge in the advertised and quoted music plan price. Ms. Balmores will be harmed if, in the future, she is left to guess as to whether Sirius XM's representations are accurate and whether there are omissions of material facts regarding the music plans being advertised and represented to her.

86.     Ms. Balmores first learned of Sirius XM's U.S. Music Royalty Fee scheme on February 15, 2023, when she saw a legal investigation advertisement on TopClassActions.com discussing the scheme. Prior to reading the advertisement, Ms. Balmores did not know or suspect that Sirius XM was secretly adding an additional music plan charge above the quoted rate in the form of the U.S. Music Royalty Fee. Ms. Balmores completed and submitted a form on the investigation webpage that same day, February 15, 2023, to learn if she qualified to be part of the legal actions.

87.     On March 22, 2023, Ms. Balmores sent Sirius XM a notice of dispute regarding her claims concerning Sirius XM's deceptive pricing and the U.S. Music Royalty Fee. Sirius XM made no effort to resolve the dispute.

88.     On June 5, 2023, Ms. Balmores filed a demand for arbitration against Sirius XM with the American Arbitration Association ("AAA").

89.     Ms. Balmores paid all arbitration fees associated with her demand for arbitration that the AAA asked her to pay.

CLASS ACTION COMPLAINT - 23

90.     The AAA then asked Sirius XM to pay its required arbitration fees by August 28, 2023.

91.     On August 7, 2023, Sirius XM wrote a letter to the AAA stating that it would not pay its arbitration fees.

92.     On September 6, 2023, the AAA administratively closed Ms. Balmores' case due to Sirius XM's failure to pay its required arbitration fees.

**Plaintiff Justin Braswell**

93.     Plaintiff Justin Braswell is, and at all relevant times has been, a citizen and resident of the city of Spanaway, in Pierce County, Washington.

94.     In June 2011, Mr. Braswell visited Sirius XM's website to learn about Sirius XM's music plans and prices. After reviewing Sirius XM's music plans and prices, Mr. Braswell selected a plan and went through the online purchase process. Throughout the online purchase process, Sirius XM advertised and promised a specific monthly price for the music plan subscription. That price did not include the amount of the U.S. Music Royalty Fee. None of the webpages made any reference to the U.S. Music Royalty Fee or its amount. Based on these representations, Mr. Braswell entered his credit card information and submitted his order on the Sirius XM website.

95.     At no point was Mr. Braswell aware that Sirius XM would bill him any additional monthly music plan charges above the specific monthly price that was advertised and promised to him. At no point did Mr. Braswell view any mention of the existence of the U.S. Music Royalty Fee or its amount.

96.     After Mr. Braswell signed up, Sirius XM never emailed or mailed him a single monthly billing notice or invoice.

97.     In 2013, Mr. Braswell bought a car that automatically came with a free Sirius XM trial subscription.

98.     After the free trial subscription for the car expired, Mr. Braswell visited Sirius XM's website to learn about the Sirius XM music plan offers then available for the car. Based on the advertisements and prices presented to him, Mr. Braswell selected a plan and went

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

through the online purchase process. Throughout the online purchase process, Sirius XM advertised and promised a specific monthly price for the music plan. That price did not include the amount of the U.S. Music Royalty Fee. None of the webpages made any reference to the U.S. Music Royalty Fee or its amount. Based on these representations, Mr. Braswell submitted his order on Sirius XM's website.

99.     At no point was Mr. Braswell aware that Sirius XM would bill him any additional monthly music plan charges above the specific monthly price that was advertised and promised to him. At no point did Mr. Braswell view any mention of the existence of the U.S. Music Royalty Fee or its amount.

100.     After Mr. Braswell signed up, Sirius XM never emailed or mailed him a single monthly billing notice or invoice.

101.     In 2022, Mr. Braswell bought another car that automatically came with a free Sirius XM trial subscription.

102.     After the free trial subscription for the car expired, Mr. Braswell visited Sirius XM's website to learn about the Sirius XM music plan offers then available for the car. Based on the advertisements and prices presented to him, Mr. Braswell selected a plan and went through the online purchase process. Throughout the online purchase process, Sirius XM advertised and promised a specific monthly price for the music plan. That price did not include the amount of the U.S. Music Royalty Fee. None of the webpages made any reference to the U.S. Music Royalty Fee or its amount. Based on these representations, Mr. Braswell submitted his order on Sirius XM's website.

103.     At no point was Mr. Braswell aware that Sirius XM would bill him any additional monthly music plan charges above the specific monthly price that was advertised and promised to him. At no point did Mr. Braswell view any mention of the existence of the U.S. Music Royalty Fee or its amount.

104.     After Mr. Braswell signed up, Sirius XM never emailed or mailed him a single monthly billing notice or invoice.

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

105.     Each time that Mr. Braswell signed up for a Sirius XM music plan, he was relying on Sirius XM's explicit representations regarding the monthly price of the music plan. Mr. Braswell did not expect (and he was never told) that Sirius XM would actually charge him an additional music plan charge on top of the advertised and quoted music plan price in the form of a so-called U.S. Music Royalty Fee or that the true price of the music plan would include the additional cost of the U.S. Music Royalty Fee. That information would have been material to him. Had he known that information he would not have been willing to pay as much for his music plans and would have acted differently.

106.     Mr. Braswell has a legal right to rely now, and in the future, on the truthfulness and accuracy of Sirius XM's representations and advertisements regarding its music plan prices.

107.     Mr. Braswell remains a Sirius XM subscriber as of this filing. Mr. Braswell desires to sign up for Sirius XM music plans in the future. However, Mr. Braswell wants to be confident that the advertised and quoted price for Sirius XM's music plans is the true and full price for the plan (i.e., that it includes all applicable discretionary monthly service charges such as the U.S. Music Royalty Fee). And, if Sirius XM introduces any new or invented discretionary monthly service charge (like it did with the U.S. Music Royalty Fee), Mr. Braswell wants to be confident that Sirius XM will include the amount of that service charge in the advertised and quoted music plan price. Mr. Braswell will be harmed if, in the future, he is left to guess as to whether Sirius XM's representations are accurate and whether there are omissions of material facts regarding the music plans being advertised and represented to him.

108.     Mr. Braswell first learned of Sirius XM's U.S. Music Royalty Fee scheme on May 9, 2023, when he saw a legal investigation advertisement on TopClassActions.com discussing the scheme. Prior to reading the advertisement, Mr. Braswell did not know or suspect that Sirius XM had been secretly adding an additional music plan charge above the quoted rate in the form of the U.S. Music Royalty Fee. Mr. Braswell completed and submitted a form on the investigation webpage that same day, May 9, 2023, to learn if he qualified to be part of the legal actions.

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

109.    On June 1, 2023, Mr. Braswell sent Sirius XM a notice of dispute regarding his claims concerning Sirius XM's deceptive pricing and the U.S. Music Royalty Fee. Sirius XM made no effort to resolve the dispute.

110.    On August 6, 2023, Mr. Braswell filed a demand for arbitration against Sirius XM with the American Arbitration Association ("AAA").

111.    Mr. Braswell paid all arbitration fees associated with his demand for arbitration that the AAA asked him to pay.

112.    The AAA then asked Sirius XM to pay its required arbitration fees by November 3, 2023.

113.    On October 18, 2023, Sirius XM wrote a letter to the AAA stating that it would not pay its arbitration fees.

114.    On November 8, 2023, the AAA administratively closed Mr. Braswell's case due to Sirius XM's failure to pay its required arbitration fees.

**Plaintiff Deborah Garvin**

115.    Plaintiff Deborah Garvin has been a citizen and resident of the city of Vancouver, in Clark County, Washington, since 2022. Prior to that, she was a citizen and resident of Florida.

116.    In 2018, while living in Florida, Ms. Garvin leased a new car that came with a free Sirius XM trial music plan subscription.

117.    After the free trial subscription expired, she received a call from a Sirius XM agent who was trying to get her to sign up for a paid subscription. The agent that Ms. Garvin spoke to offered her a paid subscription, where the first six months would be free, and she would thereafter be charged a specific monthly rate for the music plan. The quoted and promised price did not include the additional amount of the U.S. Music Royalty Fee, and the agent also did not mention the existence of the U.S. Music Royalty Fee.

118.    Relying on the representations of the Sirius XM agent, Ms. Garvin provided her credit card information to the agent and signed up for the music plan subscription.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

119.     Approximately six months later, before she was charged at the higher rate, Ms. Garvin canceled her subscription. After she canceled her subscription, she received a call from a Sirius XM agent who was trying to get her to sign up for a subscription once again. The agent that Ms. Garvin spoke to offered her a promotional monthly price for one of Sirius XM's music plans. The quoted and promised price did not include the additional amount of the U.S. Music Royalty Fee, and the agent also did not mention the existence of the U.S. Music Royalty Fee.

120.     Relying on the representations of the Sirius XM agent, Ms. Garvin purchased the monthly music plan subscription.

121.     Each month thereafter, Sirius XM silently and automatically charged Ms. Garvin's credit card, without giving her any email or mail notice whatsoever of the upcoming monthly charges and without ever emailing or mailing her a single monthly billing statement or invoice.

122.     Ms. Garvin stayed on this plan for the remainder of her time living in Florida.

123.     In 2022, Ms. Garvin moved to Washington. Shortly after her move, the lease on her car ended and she returned it to a dealership. Ms. Garvin canceled her Sirius XM subscription when she returned the car.

124.     Ms. Garvin then purchased a new car, which again came with a free Sirius XM trial subscription.

125.     After the free trial subscription expired, she again received a call from a Sirius XM agent who was trying to get her to sign up for a paid subscription. The agent that Ms. Garvin spoke to offered her a specific promotional monthly price for one of Sirius XM's music plans. The quoted and promised price did not include the additional amount of the U.S. Music Royalty Fee, and the agent also did not mention the existence of the U.S. Music Royalty Fee.

126.     Relying on the representations of the Sirius XM agent, Ms. Garvin purchased the monthly music plan subscription.

127.     Each month thereafter, Sirius XM silently and automatically charged Ms. Garvin's credit card, without giving her any email or mail notice whatsoever of the

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

upcoming monthly charges and without ever emailing or mailing her a single monthly billing statement or invoice.

128.     Each time that Ms. Garvin signed up for a Sirius XM music plan, she was relying on Sirius XM's explicit representations regarding the monthly price of the music plan. Ms. Garvin did not expect (and she was never told) that Sirius XM would actually charge her an additional music plan charge on top of the advertised and quoted music plan price in the form of a so-called U.S. Music Royalty Fee or that the true price of the music plan would include the additional cost of the U.S. Music Royalty Fee. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her music plans and would have acted differently.

129.     Ms. Garvin has a legal right to rely now, and in the future, on the truthfulness and accuracy of Sirius XM's representations and advertisements regarding its music plan prices. Ms. Garvin believes that she was given the services Sirius XM promised her—just not at the prices Sirius XM promised and advertised to her.

130.     Ms. Garvin remains a Sirius XM subscriber as of this filing. Ms. Garvin desires to sign up for Sirius XM music plans in the future. However, Ms. Garvin wants to be confident that the advertised and quoted price for Sirius XM's music plans is the true and full price for the plan (i.e., that it includes all applicable discretionary monthly service charges such as the U.S. Music Royalty Fee). And, if Sirius XM introduces any new or invented discretionary monthly service charge (like it did with the U.S. Music Royalty Fee), Ms. Garvin wants to be confident that Sirius XM will include the amount of that service charge in the advertised and quoted music plan price. Ms. Garvin will be harmed if, in the future, she is left to guess as to whether Sirius XM's representations are accurate and whether there are omissions of material facts regarding the music plans being advertised and represented to her.

131.     Ms. Garvin first learned of Sirius XM's U.S. Music Royalty Fee scheme on May 29, 2023, when she saw a legal investigation advertisement on the Hattislaw.com website discussing the scheme. Prior to reading the investigation webpage, Ms. Garvin did not know or suspect that Sirius XM was secretly adding an additional music plan charge above the quoted

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

rate in the form of the U.S. Music Royalty Fee. Ms. Garvin completed and submitted a form on the investigation webpage that same day, May 29, 2023, to learn if she qualified to be part of the legal actions.

132.    On June 1, 2023, Ms. Garvin sent Sirius XM a notice of dispute regarding her claims concerning Sirius XM's deceptive pricing and the U.S. Music Royalty Fee. Sirius XM made no effort to resolve the dispute.

133.    On August 6, 2023, Ms. Garvin filed a demand for arbitration against Sirius XM with the American Arbitration Association ("AAA").

134.    Ms. Garvin paid all arbitration fees associated with her demand for arbitration that the AAA asked her to pay.

135.    The AAA then asked Sirius XM to pay its required arbitration fees by November 3, 2023.

136.    On October 18, 2023, Sirius XM wrote a letter to the AAA stating that it would not pay its arbitration fees.

137.    On November 8, 2023, the AAA administratively closed Ms. Garvin's case due to Sirius XM's failure to pay its required arbitration fees.

**Plaintiff Thea Anderson**

138.    Plaintiff Thea Anderson is, and at all relevant times has been, a citizen and resident of the city of Spokane, in Spokane County, Washington.

139.    In mid-2022, Ms. Anderson purchased a car that came with a free three-month Sirius XM music plan trial subscription.

140.    In late October, after her free trial subscription ended, Sirius XM called Ms. Anderson to try to sign her up for a paid subscription. The Sirius XM agent offered her a specific promotional price of $5.99 a month for 12 months for the Music & Entertainment music plan. The quoted and promised $5.99 price did not include the additional amount of the U.S. Music Royalty Fee. The agent also did not mention the existence of the U.S. Music Royalty Fee.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

141.   Relying on the representations of the Sirius XM agent, Ms. Anderson purchased the music plan subscription.

142.   In late 2023, Ms. Anderson called Sirius XM to ask for a better rate for the music plan. The agent that she spoke to quoted her a specific price for the music plan. The quoted and promised price did not include the additional amount of the U.S. Music Royalty Fee, and the agent also did not mention the existence of the U.S. Music Royalty Fee.

143.   Relying on the representations of the Sirius XM agent, Ms. Anderson purchased the music plan subscription.

144.   Sirius XM never emailed or mailed Ms. Anderson a single monthly billing notice or invoice. Meanwhile, Sirius XM silently and automatically charged Ms. Anderson's credit card month after month.

145.   In early 2024, Ms. Anderson canceled her Sirius XM subscription.

146.   Each time that Ms. Anderson signed up for a Sirius XM music plan, she was relying on Sirius XM's explicit representations regarding the monthly price of the music plan. Ms. Anderson did not expect (and she was never told) that Sirius XM would actually charge her an additional music plan charge on top of the advertised and quoted music plan price in the form of a so-called U.S. Music Royalty Fee or that the true price of the music plan would include the 21.4% additional cost of the U.S. Music Royalty Fee. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her music plans and would have acted differently.

147.   Ms. Anderson has a legal right to rely now, and in the future, on the truthfulness and accuracy of Sirius XM's representations and advertisements regarding its music plan prices. Ms. Anderson believes that she was given the services Sirius XM promised her—just not at the prices Sirius XM promised and advertised to her.

148.   Ms. Anderson desires to sign up for Sirius XM music plans in the future. However, Ms. Anderson wants to be confident that the advertised and quoted price for Sirius XM's music plans is the true and full price for the plan (i.e., that it includes all applicable discretionary monthly service charges such as the U.S. Music Royalty Fee). And, if Sirius XM

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

introduces any new or invented discretionary monthly service charge (like it did with the U.S. Music Royalty Fee), Ms. Anderson wants to be confident that Sirius XM will include the amount of that service charge in the advertised and quoted music plan price. Ms. Anderson will be harmed if, in the future, she is left to guess as to whether Sirius XM's representations are accurate and whether there are omissions of material facts regarding the music plans being advertised and represented to her.

149.    Ms. Anderson first learned of Sirius XM's U.S. Music Royalty Fee scheme on May 15, 2023, when she saw a legal investigation advertisement on TopClassActions.com discussing the scheme. Prior to reading the advertisement, Ms. Anderson did not know or suspect that Sirius XM was secretly adding an additional music plan charge above the quoted rate in the form of the U.S. Music Royalty Fee. Ms. Anderson completed and submitted a form on the investigation webpage that same day, May 15, 2023, to learn if she qualified to be part of the legal actions.

150.    On June 1, 2023, Ms. Anderson sent Sirius XM a notice of dispute regarding her claims concerning Sirius XM's deceptive pricing and the U.S. Music Royalty Fee. Sirius XM made no effort to resolve the dispute.

151.    On August 6, 2023, Ms. Anderson filed a demand for arbitration against Sirius XM with the American Arbitration Association ("AAA").

152.    Ms. Anderson paid all arbitration fees associated with her demand for arbitration that the AAA asked her to pay.

153.    The AAA then asked Sirius XM to pay its required arbitration fees by November 3, 2023.

154.    On October 18, 2023, Sirius XM wrote a letter to the AAA stating that it would not pay its arbitration fees.

155.    On November 8, 2023, the AAA administratively closed Ms. Anderson's case due to Sirius XM's failure to pay its required arbitration fees.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

**CLASS ALLEGATIONS**

156.    Plaintiffs Cindy Balmores, Justin Braswell, Deborah Garvin, and Thea Anderson bring this lawsuit on behalf of themselves, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

157.    **Washington Class Definition:** Plaintiffs Cindy Balmores, Justin Braswell, Deborah Garvin, and Thea Anderson seek to represent the following "Washington Class":

>    **All current and former Sirius XM subscribers in Washington who paid a "U.S. Music Royalty Fee" within the applicable statute of limitations.**

158.    **Florida Class Definition:** Plaintiff Deborah Garvin also seeks to represent the following "Florida Class":

>    **All current and former Sirius XM subscribers in Florida who paid a "U.S. Music Royalty Fee" within the applicable statute of limitations.**

159.    **Application of the Discovery Rule.** This Court should apply the discovery rule to extend any applicable limitations period and corresponding class period to the date on which Sirius XM first began charging the U.S. Music Royalty Fee—which, based on the investigation of Plaintiffs' counsel, is in 2009. Plaintiffs and the Class could not have, with the exercise of reasonable diligence, learned of the accrual of their claims against Sirius XM at an earlier time because the nature of Sirius XM's misconduct was non-obvious and intentionally concealed, as described throughout the Complaint and reiterated below.

160.    First, none of Sirius XM's advertisements for its music plans names or mentions the existence of the U.S. Music Royalty Fee or its amount—not even in the fine print. Likewise, none of Sirius XM's advertisements states the true music plan price after adding the amount of the U.S. Music Royalty Fee. Reasonable consumers who viewed Sirius XM's advertisements would not know or suspect that Sirius XM's music plans were subject to a hidden double-charge for the music plan itself in the form of the U.S. Music Royalty Fee.

161.    Second, Sirius XM does not disclose the U.S. Music Royalty Fee or its amount to subscribers when they sign up for music plans, as described in detail above at ¶¶ 34–56. Reasonable consumers would justifiably rely on Sirius XM's explicit representations regarding

CLASS ACTION COMPLAINT - 33

the monthly prices of its music plans, and would reasonably believe that any extra charges would only come from legitimate government fees or taxes.

162. Notably, <u>none</u> of Sirius XM's competitors charge any separate royalty fee over and above their advertised music plan prices. Indeed, reasonable consumers would expect that the advertised price for Sirius XM's music plans would include the fundamental costs of obtaining the permissions necessary to provide the music content that Sirius XM has promised is included in those plans.

163. Reasonable consumers would have no reason to suspect that Sirius XM was actually charging them a hidden and disguised double-charge for the music plans in the form of the U.S. Music Royalty Fee.

164. <u>Third</u>, Sirius XM has implemented policies and practices which prevent its subscribers from noticing that they are being charged the Fee or from discovering its true nature. Sirius XM signs up subscribers for automatic renewal by default. Once consumers have been lured to sign up, Sirius XM prevents them from learning about its scheme by never thereafter sending them monthly or ongoing billing notices or invoices. All the while, Sirius XM silently and automatically renews their subscriptions month after month and year after year.

165. Meanwhile, if the subscriber were to log into his or her customer account on the Sirius XM website, the default view shows only the total amount due and does not list, let alone explain, the U.S. Music Royalty Fee.

166. Sirius XM also intentionally chose a name for the Fee that suggests it is a government fee. Sirius XM calls it a "U.S." fee to falsely indicate to consumers (i.e., to those few subscribers who learn about its existence) that it is government mandated or a government pass-through fee.

167. <u>Fourth</u>, in the event that a subscriber happens to notice that the U.S. Music Royalty Fee has been charged and contacts Sirius XM to inquire about the Fee, Sirius XM agents outright falsely tell subscribers that the Fee is "government mandated" or is a government pass-through fee, as documented above at ¶¶ 66–68. A reasonable consumer would

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

take Sirius XM at its word and believe that the U.S. Music Royalty Fee was a government-related fee. Thus, a reasonable consumer would not discover the true nature of the Fee or discover Sirius XM's deceptive pricing scheme even if they somehow learned of its existence (however, the vast majority of subscribers never notice the existence of the Fee at all).

168.    **Numerosity.** The number of members of the Classes (the "Class members") are so numerous that joinder of all members would be impracticable. Plaintiffs do not know the exact number of Class members prior to discovery. However, based on information and belief, the Classes comprises millions of individuals. The exact number and identities of Class members are contained in Sirius XM's records and can be easily ascertained from those records.

169.    **Commonality and Predominance.** This action involves multiple common legal or factual questions which are capable of generating class-wide answers that will drive the resolution of this case. These common questions predominate over any questions affecting individual Class members, if any. These common questions include, but are not limited to, the following:

a.      Whether Sirius XM employed a uniform policy of charging the U.S. Music Royalty Fee to Plaintiffs and Class members who subscribed to its music plans;

b.      Whether Sirius XM's policy and practice of advertising and quoting the prices of its music plans without the amount of the U.S. Music Royalty Fee is false, deceptive, or misleading;

c.      Why did Sirius XM not include the amounts of the U.S. Music Royalty Fee in the advertised and quoted prices for its music plans;

d.      Whether Sirius XM adequately and accurately disclosed the existence of the U.S. Music Royalty Fee, its nature or basis, or its amount, to Plaintiffs and Class members;

e.      What is the nature or purpose of the U.S. Music Royalty Fee;

f.      Whether it was deceptive, misleading, and/or false for Sirius XM to put "U.S." in the beginning of the name of the U.S. Music Royalty Fee;

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

g.      Whether the true prices of Sirius XM's music plans, and of the U.S. Music Royalty Fee, are material information, such that a reasonable consumer would find that information important to the consumer's purchase decision;

h.      Whether Sirius XM has a policy and practice of signing up subscribers for automatic renewal, but never thereafter sending the subscriber any monthly or ongoing billing notices or invoices;

i.      Whether Sirius XM has a policy of intentionally preventing subscribers from noticing that they are being charged the Fee, including, but not limited to, Sirius XM's practice of signing up subscribers for automatic renewal but then never thereafter sending the subscriber any monthly or ongoing billing notices or invoices;

j.      Whether Sirius XM has a practice of falsely telling subscribers who notice and inquire about the U.S. Music Royalty Fee that it is "government mandated" or is a government pass-through fee;

k.      Whether Sirius XM's misrepresentations and misconduct alleged herein violate the Washington Consumer Protection Act, RCW Chapter 19.86 ("CPA");

l.      Whether Sirius XM's misrepresentations and misconduct alleged herein violate the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"); and

m.      Whether Sirius XM has violated the covenant of good faith and fair dealing, implied in its contracts with Plaintiffs and Class members, by imposing the U.S. Music Royalty Fee in the manner alleged herein.

170.    **Typicality.** Plaintiffs' claims are typical of Class members' claims. Plaintiffs and Class members all sustained injury as a direct result of Sirius XM's standard practices and schemes, bring the same claims, and face the same potential defenses.

171.    **Adequacy.** Plaintiffs and their counsel will fairly and adequately protect Class members' interests. Plaintiffs have no interests antagonistic to Class members' interests and are committed to representing the best interests of the Class members. Moreover, Plaintiffs have retained counsel with considerable experience and success in prosecuting complex class action and consumer protection cases.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

172.    **Superiority.** A class action is superior to all other available methods for fairly and efficiently adjudicating this controversy. Each Class member's interests are small compared to the burden and expense required to litigate each of his or her claims individually, so it would be impractical and would not make economic sense for Class members to seek individual redress for Sirius XM's conduct. Individual litigation would add administrative burden on the courts, increasing the delay and expense to all parties and to the court system. Individual litigation would also create the potential for inconsistent or contradictory judgments regarding the same uniform conduct. A single adjudication would create economies of scale and comprehensive supervision by a single judge. Moreover, Plaintiffs do not anticipate any difficulties in managing a class action trial.

173.    By its conduct and omissions alleged herein, Sirius XM has acted and refused to act on grounds that apply generally to the Class members, such that declaratory relief is appropriate respecting the Classes as a whole.

174.    Sirius XM is primarily engaged in the business of selling services. Each cause of action brought by Plaintiffs against Sirius XM in this Complaint arises from and is limited to statements or conduct by Sirius XM that consist of representations of fact about Sirius XM's business operations or services that are or were made for the purpose of obtaining approval for, promoting, or securing sales of or commercial transactions in, Sirius XM's services or the statements are or were made in the course of delivering Sirius XM's services. Each cause of action brought by Plaintiffs against Sirius XM in this Complaint arises from and is limited to statements or conduct by Sirius XM for which the intended audience is an actual or potential customer or subscriber, or a person likely to repeat the statements to, or otherwise influence, an actual or potential customer or subscriber.

## CAUSES OF ACTION

### COUNT I
### Violation of the Washington Consumer Protection Act
### RCW Chapter 19.86

175.    Plaintiffs Cindy Balmores, Justin Braswell, Deborah Garvin, and Thea Anderson reallege and incorporate by reference all paragraphs previously alleged herein.

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

176.    Each Plaintiff brings this claim in his or her individual capacity, in his or her capacity as a private attorney general seeking the imposition of public injunctive relief to protect the general public, and as a representative of the Washington Class.

177.    The Washington Consumer Protection Act (the "CPA"), RCW 19.86, is Washington's principal consumer protection statute. The CPA broadly declares unlawful all "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020.

178.    The CPA allows any person "who is injured in his or his business or property by a violation of RCW 19.86.020" to bring an action to enjoin further violations and to recover actual damages (which may be trebled), costs, and attorneys' fees. RCW 19.86.090.

179.    Sirius XM engages in the conduct of trade or commerce. For example, and without limitation, Sirius XM engages in the sale of its music service plans and engages in commerce directly or indirectly affecting the people of Washington.

180.    By its conduct and omissions alleged herein, Sirius XM has committed unfair methods of competition and/or unfair or deceptive acts or practices which directly or indirectly affect the people of the State of Washington, and which caused injury to Plaintiffs and the Class members' business or property, including without limitation by:

    a.    Misrepresenting the prices of Sirius XM's music plans and concealing the true prices of its music plans, including by advertising or quoting prices that did not include the U.S. Music Royalty Fee;

    b.    Failing to disclose the Fee—or to even mention the words "U.S. Music Royalty Fee"—in any Sirius XM advertising, including in the fine print;

    c.    Failing to disclose or adequately disclose the existence, nature, and amount of the U.S. Music Royalty Fee when consumers signed up for Sirius XM's music plans;

    d.    Failing to ever adequately or accurately disclose the existence and nature of the U.S. Music Royalty Fee to its subscribers;

    e.    Failing to disclose and misrepresenting the nature of the U.S. Music Royalty Fee by disguising it as "Fees and Taxes";

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

f.      Signing up customers for automatic renewal by default but never thereafter sending the customer any monthly or ongoing billing notices or invoices, thereby further preventing its subscribers from discovering the U.S. Music Royalty Fee scheme;

g.      Putting "U.S." in the beginning of the name of the U.S. Music Royalty Fee to falsely indicate to consumers that it is a government-related fee; and

h.      Falsely stating to subscribers who discovered and inquired about the U.S. Music Royalty Fee that it is "government mandated" or is a government pass-through fee.

181.   With respect to any omissions, Sirius XM at all relevant times had a duty to disclose the information in question because, inter alia: (a) Sirius XM had exclusive knowledge of material information that was not known to Plaintiffs and Class members; (b) Sirius XM concealed material information from Plaintiffs and Class members; and (c) Sirius XM made partial representations, including regarding the supposed price of its music plans, which were false and misleading absent the omitted information.

182.   The acts and omissions of Sirius XM pled herein are injurious to the public interest because said acts and omissions: (a) injured other persons in addition to Plaintiffs; (b) had the capacity to injure other persons; or (c) has the capacity to injure other persons. *See* RCW 19.86.093(3).

183.   The unlawful acts and omissions pled herein were committed in the course of Sirius XM's business. The unlawful acts and omissions pled herein were, are and continue to be part of a pattern or generalized course of conduct. The acts and omissions of Sirius XM pled herein were and are not reasonable in relation to the development and preservation of business.

184.   Sirius XM's unlawful conduct was intended to, or had the capacity to, deceive a substantial portion of the public.

185.   Further, under Washington law, "[t]he capacity of a marketing technique to deceive is determined with reference to the least sophisticated consumers among us." *Keithly v. Intelius*, 764 F. Supp. 2d 1257, 1268 (W.D. Wash. 2011).

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

186.    Sirius XM's misrepresentations are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

187.    As a direct, substantial, and/or proximate result of Sirius XM's unlawful conduct, Plaintiffs and Class members suffered injury to their business or property.

188.    Plaintiffs and Class members reasonably relied on Sirius XM's material misrepresentations, and would not have purchased, or would have paid less money for, Sirius XM's music plans had they known the truth.

189.    By its conduct and omissions alleged herein, Sirius XM caused the demand for its music plans to be artificially increased and caused all subscribers of those plans, including Plaintiffs and Class members, to pay premiums to Sirius XM.

190.    Sirius XM's conduct has caused substantial injury to Plaintiffs, Class members, and the general public.

191.    **Permanent injunctive relief.** The Washington Supreme Court has repeatedly held that consumers' ability to enjoin unlawful business practices is a primary purpose of the CPA.

192.    The Washington Supreme Court ruled in *Hockley v Hargitt*, 82 Wash.2d 337, 350–51 (1973) that:

> '[T]he purpose of this [consumer protection] act is … to foster fair and honest competition .. To this end this act shall be liberally construed that its beneficial purposes may be served.' **This broad public policy is best served by permitting an injured individual to enjoin future violations of RCW 19.86, even if such violations would not directly affect the individual's own private rights.** If each consumer victim were limited to injunctive relief tailored to his own individual interest, the fraudulent practices might well continue unchecked while a multiplicity of suits developed. On the other hand, if a single litigant is allowed to represent the public and consumer fraud is proven, the multiplicity of suits is avoided and **the illegal scheme brought to a halt**. (Emphasis added.)

193.    The Washington Supreme Court held the following in *Lightfoot v. MacDonald*, 86 Wash.2d 331, 336–37 (1976):

> We think **the evident purpose of the legislature** in providing a private remedy in RCW 19.86.170, was much the same as that which Congress expressed in providing

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

for treble damage actions under the antitrust laws. Its purpose **was to enlist the aid of private individuals damaged by acts or practices which were forbidden in the acts, to assist in the enforcement of the laws**. (Emphasis added.)

194.    The Washington Supreme Court ruled in *Scott v. Cingular Wireless*, 160 Wash.2d 843, 853 (2007) that consumers' ability to enjoin unlawful business practices—both on behalf of a class of similarly situated consumers and for the benefit of the general public—is necessary to vindicate the purpose of the CPA:

> **Private citizens act as private attorneys general** in protecting the public's interest against unfair and deceptive acts and practices in trade and commerce. *Lightfoot v. MacDonald*, 86 Wash.2d 331, 335–36, 544 P.2d 88 (1976). **Consumers bringing actions under the CPA do not merely vindicate their own rights; they represent the public interest and may seek injunctive relief even when the injunction would not directly affect their own private interests**… Without **class action suits** the public's ability to perform this function is drastically diminished. (Emphasis added.)

195.    The balance of the equities favors the entry of permanent injunctive relief against Sirius XM. Plaintiffs, the members of the Class, honest competing businesses, and the general public will be irreparably harmed from Sirius XM's ongoing false advertising absent the entry of permanent injunctive relief against Sirius XM.

196.    Plaintiffs lack an adequate remedy at law to prevent Sirius XM's continued unlawful practices. Plaintiffs will be harmed in the future by their inability to rely on the truthfulness and accuracy of Sirius XM's representations and advertisements regarding its music plan prices. Plaintiffs desire and intend to sign up for different Sirius XM music plans and/or to sign up for another promotional period or contract in the future. However, Plaintiffs want to be confident that the advertised and quoted price for Sirius XM's music plans is the true and full price for the plan (i.e., that it includes all applicable discretionary service charges). And, if Sirius XM introduces any new discretionary service charge, Plaintiffs want to be confident that Sirius XM will include the amount of that service charge in the advertised and quoted music plan price. Plaintiffs will be harmed if, in the future, they are left to guess as to whether Sirius XM's representations are accurate and whether there are omissions of material facts regarding the music plans being advertised and represented to them.

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

197.    Monetary damages are not an adequate remedy at law for <u>future</u> harm. *Clark v. Eddie Bauer LLC*, No. 21-35334, 2024 WL 177755, at *3 (9th Cir. Jan. 17, 2024). Monetary damages are inadequate for future harm for the following reasons, without limitation: <u>First</u>, damages are not an adequate remedy for future harm because they will not prevent Sirius XM from continuing its unlawful conduct. <u>Second</u>, damages for future harm cannot be calculated with certainty and thus cannot be awarded. For example, it is impossible to know: (a) what music plan(s) Plaintiffs may want or need in the future; (b) what Sirius XM's future U.S. Music Royalty Fees will be (given that the Fee is calculated as a percentage of the quoted music plan price, and given that Sirius XM has increased the percentage rate of the Fee over time); or (c) how many months Plaintiffs would continue to subscribe to Sirius XM's services. Because these factors are unknown, damages are impossible to calculate and cannot be awarded for future harm. <u>Third</u>, injunctive relief is necessary (and monetary damages do not provide a plain, adequate and complete remedy) because, without forward-looking injunctive relief enjoining the unlawful practices, the courts would be flooded with future lawsuits by the general public, Class members, and Plaintiffs for future violations of the law by Sirius XM.

198.    Plaintiffs, on behalf of themselves and as private attorneys general, seek public injunctive relief under the CPA to protect the general public from Sirius XM's false advertisements, misrepresentations, and omissions. Specifically, Plaintiffs seek a permanent public injunction against Sirius XM under the CPA as follows: **(1)** enjoin Sirius XM from falsely advertising the prices of its music plans to members of the general public; **(2)** enjoin Sirius XM from advertising or quoting a music plan price to members of the general public if that price does not include all applicable discretionary service charges (such as the U.S. Music Royalty Fee); and **(3)** enjoin Sirius XM from representing to members of the public that the U.S. Music Royalty Fee is a "government mandated" charge, a pass-through government charge, a charge imposed to recover costs billed to Sirius XM by the government, a tax, or a charge over which Sirius XM has no control.

199.    Sirius XM's misconduct which affects the general public is ongoing in part or in whole and even if such conduct were to cease, it is behavior that is capable of repetition or re-

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1  occurrence by Sirius XM absent a permanent injunction. Accordingly, Plaintiffs seek an order

2  enjoining Sirius XM from committing these practices which harm the general public.

3                                           **COUNT II**
   **Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
4                         **Fla. Stat. §§ 501.201, et seq.**

5       200.    Plaintiff Deborah Garvin realleges and incorporates by reference all paragraphs

6  previously alleged herein.

7       201.    Ms. Garvin brings this claim in her individual capacity, in her capacity as a

8  private attorney general seeking the imposition of public injunctive relief to protect the general

9  public, and as a representative of the Florida Class.

10      202.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") allows any

11 person "who has suffered a loss as a result of a violation of this [Act]" to bring an action to

12 enjoin further violations and to recover actual damages, costs, and attorneys' fees. Fla. Stat. §

13 501.211(1), (2); Fla. Stat. § 501.2105(1).

14      203.    Ms. Garvin is a "consumer" within the meaning of Fla. Stat. § 501.203(7).

15      204.    Sirius XM engaged in "trade or commerce" within the meaning of Fla. Stat.

16 § 501.203(8).

17      205.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or

18 practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce…."

19 Fla. Stat. § 501.204(1).

20      206.    By its conduct and omissions alleged herein, Sirius XM has committed unfair

21 methods of competition and/or unfair or deceptive acts or practices in violation of the

22 FDUTPA, including without limitation by:

23             a.    Misrepresenting the prices of Sirius XM's music plans and concealing

24 the true prices of its music plans, including by advertising or quoting prices that did not include

25 the U.S. Music Royalty Fee;

26             b.    Failing to disclose the Fee—or to even mention the words "U.S. Music

27 Royalty Fee"—in <u>any</u> Sirius XM advertising, including in the fine print;

28

CLASS ACTION COMPLAINT - 43

c.       Failing to disclose or adequately disclose the existence, nature, and amount of the U.S. Music Royalty Fee when consumers signed up for Sirius XM's music plans;

d.       Failing to ever adequately or accurately disclose the existence and nature of the U.S. Music Royalty Fee to its subscribers;

e.       Failing to disclose and misrepresenting the nature of the U.S. Music Royalty Fee by disguising it as "Fees and Taxes";

f.       Signing up customers for automatic renewal by default but never thereafter sending the customer any monthly or ongoing billing notices or invoices, thereby further preventing its subscribers from discovering the U.S. Music Royalty Fee scheme;

g.       Putting "U.S." in the beginning of the name of the U.S. Music Royalty Fee to falsely indicate to consumers that it is a government-related fee; and

h.       Falsely stating to subscribers who discovered and inquired about the U.S. Music Royalty Fee that it is "government mandated" or is a government pass-through fee.

207.    With respect to any omissions, Sirius XM at all relevant times had a duty to disclose the information in question because, inter alia: (a) Sirius XM had exclusive knowledge of material information that was not known to Ms. Garvin and Florida Class members; (b) Sirius XM concealed material information from Ms. Garvin and Florida Class members; and (c) Sirius XM made partial representations, including regarding the supposed price of its music plans, which were false and misleading absent the omitted information.

208.    The unlawful acts and omissions pled herein were committed in the course of Sirius XM's business. The unlawful acts and omissions pled herein were, are and continue to be part of a pattern or generalized course of conduct. The acts and omissions of Sirius XM pled herein were and are not reasonable in relation to the development and preservation of business.

209.    Sirius XM's unlawful conduct was intended to, or had the capacity to, deceive a substantial portion of the public.

210.    Sirius XM's misrepresentations are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

211. As a result of Sirius XM's unlawful conduct, Ms. Garvin and Florida Class members have suffered a loss.

212. Ms. Garvin and Florida Class members reasonably relied on Sirius XM's material misrepresentations, and would not have purchased, or would have paid less money for, Sirius XM's music plans had they known the truth.

213. By its conduct and omissions alleged herein, Sirius XM caused the demand for its music plans to be artificially increased and caused all subscribers of those plans, including Ms. Garvin and Florida Class members, to pay premiums to Sirius XM.

214. Sirius XM's conduct has caused substantial injury to Ms. Garvin, Florida Class members, and the general public.

215. **Permanent injunctive relief.** The balance of the equities favors the entry of permanent injunctive relief against Sirius XM. Ms. Garvin, Florida Class members, honest competing businesses, and the general public will be irreparably harmed from Sirius XM's ongoing false advertising absent the entry of permanent injunctive relief against Sirius XM.

216. Ms. Garvin, on behalf of herself and as a private attorney general, seeks public injunctive relief under the FDUTPA to protect the general public from Sirius XM's false advertisements, misrepresentations, and omissions. Specifically, Ms. Garvin seeks a permanent public injunction against Sirius XM under the FDUTPA as follows: **(1)** enjoin Sirius XM from falsely advertising the prices of its music plans to members of the general public; **(2)** enjoin Sirius XM from advertising or quoting a music plan price to members of the general public if that price does not include all applicable discretionary service charges (such as the U.S. Music Royalty Fee); and **(3)** enjoin Sirius XM from representing to members of the public that the U.S. Music Royalty Fee is a "government mandated" charge, a pass-through government charge, a charge imposed to recover costs billed to Sirius XM by the government, a tax, or a charge over which Sirius XM has no control.

217. Sirius XM's misconduct which affects the general public is ongoing in part or in whole and even if such conduct were to cease, it is behavior that is capable of repetition or re-

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1  occurrence by Sirius XM absent a permanent injunction. Accordingly, Ms. Garvin seeks an

2  order enjoining Sirius XM from committing these practices which harm the general public.

3  **COUNT II**

4  **Breach of the Implied Covenant of Good Faith and Fair Dealing**

5  218.    Plaintiffs reallege and incorporate by reference all paragraphs previously alleged

6  herein.

7  219.    Plaintiffs allege this cause of action in the alternative.

8  220.    To the extent any applicable contract could be read as granting Sirius XM

9  discretion to impose the U.S. Music Royalty Fee—which Plaintiffs do not concede—that

10  discretion is not unlimited, but rather is limited by the covenant of good faith and fair dealing

11  implied in every contract by Washington law and by Florida law.

12  221.    Sirius XM has violated the covenant of good faith and fair dealing by its conduct

13  alleged herein.

14  222.    Sirius XM has abused any discretion it purportedly had under any applicable

15  contract to impose the U.S. Music Royalty Fee on Plaintiffs and Class members. For example:

16          a.    Sirius XM imposes the U.S. Music Royalty Fee as a covert way to

17  charge subscribers higher rates for its music plans without having to advertise such higher

18  rates;

19          b.    Sirius XM does not include the amount of the U.S. Music Royalty Fee in

20  the advertised and quoted prices for its music plans;

21          c.    Sirius XM fails to disclose the Fee—or to even mention the words

22  "U.S. Music Royalty Fee"—in any Sirius XM advertising, including in the fine print;

23          d.    Sirius XM fails to disclose and misrepresents the nature of the U.S.

24  Music Royalty Fee by disguising it as "Fees and Taxes";

25          e.    None of Sirius XM's competitors charge any separate royalty fee over

26  and above the advertised music plan price, such that Sirius XM knows that reasonable

27  consumers would not expect Sirius XM to charge the U.S. Music Royalty Fee. Sirius XM

28  knows that reasonable consumers would expect that the advertised price for Sirius XM's music

CLASS ACTION COMPLAINT - 46

plans would include the fundamental costs of obtaining the permissions necessary to provide the music content that Sirius XM has promised is included in those plans;

    f.  In order to prevent subscribers from noticing they are being charged the U.S. Music Royalty Fee, Sirius XM has a policy and practice of signing up subscribers for automatic renewal by default and never thereafter sending the subscriber any monthly or ongoing billing notices or invoices;

    g.  Sirius XM put "U.S." in the beginning of the name of the U.S. Music Royalty Fee to falsely indicate to consumers that it is a government-related fee; and

    h.  Sirius XM has a practice of falsely telling customers who notice and inquire about the U.S. Music Royalty Fee that it is "government mandated" or is a government pass-through fee.

  223.  Sirius XM's imposition of the U.S. Music Royalty Fee defied Plaintiffs' and Class members' reasonable expectations, was objectively unreasonable, and frustrated the basic terms of the parties' agreement. Sirius XM's conduct and actions alleged herein were done in bad faith.

  224.  Sirius XM's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and Class members the full benefit of their bargains with Sirius XM.

  225.  Plaintiffs and Class members have performed all, or substantially all, of the obligations imposed on them under any applicable agreements with Sirius XM. There is no legitimate excuse or defense for Sirius XM's conduct.

  226.  Any attempts by Sirius XM to defend its overcharging through reliance on supposed contractual provisions will be without merit. Any such provisions are either inapplicable or are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and are unenforceable in light of the intentional, deceptive and hidden nature of Sirius XM's misconduct, among other reasons. Any such provisions, if any, would not excuse Sirius XM's abuses of discretion or otherwise preclude Plaintiffs and Class members from recovering for breaches of the covenant of good faith and fair dealing.

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

227.    Plaintiffs and Class members sustained damages as a result of Sirius XM's breaches of the covenant of good faith and fair dealing.

228.    Plaintiffs and Class members seek damages in the amount of the U.S. Music Royalty Fees paid by Plaintiffs and Class members.

## PRAYER FOR RELIEF

**Public Injunctive Relief:**

A.    In order to prevent injury to the general public, Plaintiffs individually, and as private attorneys general, request that the Court enter a public injunction against Sirius XM as follows:

1.    Permanently enjoin Sirius XM from falsely advertising the prices of its music plans and from concealing the true prices of its music plans in its advertising;

2.    Permanently enjoin Sirius XM from advertising or quoting a music plan price to members of the general public if that price does not include the amount of the U.S. Music Royalty Fee;

3.    Permanently enjoin Sirius XM from advertising or quoting a music plan price to members of the general public if that price does not include all applicable discretionary service charges;

4.    Permanently enjoin Sirius XM, including Sirius XM's sales agents, from representing or stating to members of the general public that the U.S. Music Royalty Fee is any of the following: (a) a "government mandated" fee; (b) a government pass-through fee; (c) a charge imposed to recover costs billed to Sirius XM by the government; (d) a tax; or (e) a charge over which Sirius XM has no control; and

5.    Retain jurisdiction to monitor Sirius XM's compliance with the permanent public injunctive relief requested hereinabove.

**Individual And Class Relief:**

B.    On behalf of themselves and the proposed Classes (the "Class members"), Plaintiffs request that the Court order relief and enter judgment against Sirius XM as follows:

1.    Declare this action to be a proper class action, certify the proposed

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

Classes, and appoint Plaintiffs and their counsel to represent the Washington Class and appoint Ms. Garvin and her counsel to represent the Florida Class;

2.     Order that the discovery rule applies to extend any applicable limitations period and the corresponding class period for Plaintiffs and the Classes to the date on which Sirius XM first began charging the U.S. Music Royalty Fee (which, based on the investigation of Plaintiffs' counsel, is 2009);

3.     Declare that Sirius XM's conduct alleged herein violates the CPA;

4.     Order Sirius XM to pay actual damages to Plaintiffs and Washington Class members in an amount to be determined at trial but which is more than $5 million, pursuant to, without limitation, RCW 19.86.090;

5.     For an increase in the award of actual damages to Plaintiffs and Washington Class members of up to treble the actual damages pursuant to, without limitation, RCW 19.86.090;

6.     Declare that Sirius XM's conduct alleged herein violates the FDUTPA; and

7.     Order Sirius XM to pay actual damages to Ms. Garvin and Florida Class members in an amount to be determined at trial but which is more than $5 million, pursuant to, without limitation, Fla. Stat. § 501.211(2).

**Other Relief:**

C.     On behalf of themselves and the proposed Classes, and in their capacities as private attorneys general, Plaintiffs request that the Court order relief as follows:

1.     Order Sirius XM to pay attorneys' fees, costs, and pre-judgment and post-judgment interest to the extent allowed by law; and

2.     Grant such other relief as this Court deems just and proper.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA  98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted on June 21, 2024, by:

HATTIS & LUKACS

By: _____
     Daniel M. Hattis

By: _____
     Paul Karl Lukacs

By: _____
     Che Corrington

Daniel M. Hattis, WSBA No. 50428
dan@hattislaw.com
Paul Karl Lukacs, WSBA No. 56093
pkl@hattislaw.com
Che Corrington, WSBA No. 54241
che@hattislaw.com
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
Tel: 425.233.8650
Fax: 425.412.7171


DENITTIS OSEFCHEN PRINCE, P.C.

Stephen P. DeNittis (*pro hac vice* to be submitted)
sdenittis@denittislaw.com
5 Greentree Centre, Suite 410
525 Route 73 N
Marlton, New Jersey 08057
Telephone: (856) 797-9951

*Attorneys for Plaintiffs*
*and the Proposed Classes*